DATED: July 1, 2011

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | ) |
| BENJAMIN F. WARNER | ) Case No. 10-888 |
| Debtor. | ) Chapter 7 |
| MARTIN P. SHEEHAN, | ) |
| Plaintiff, | ) |
| v. | ) Adv. Proc. No. 10-100 |
| KARL K. WARNER, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Martin P. Sheehan, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate of Benjamin F. Warner (the "Debtor"), requests entry of summary judgment on his adversary complaint against Karl K. Warner ("Kasey") to recover an alleged preferential or fraudulent transfer of the Debtor's membership units in McCoy Farms, LLC, to Kasey.

For the reasons stated herein, the court finds that the Debtor's attempted transfer of his ownership units in McCoy Farms to Kasey was ineffective under McCoy Farms's November 15, 2003 First Amended and Restated Operating Agreement. Consequently, the court will deny entry of summary judgment on the basis that the Trustee has failed to demonstrate that a transfer occurred within the meaning of 11 U.S.C. §§ 547 and 548, or under applicable state law.

1

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

The Warner family owned about 175 acres of rural acreage in Barbour County, West Virginia, upon which is situated a family lodge and an 1860s farmhouse. The property serves as a congregation point for various family events. In 2002, George Warner, Sr., the father of six sons, transferred ownership of the property to McCoy Farms, LLC. Pursuant to the First Amended and Restated Operating Agreement, dated November 15, 2003, twelve membership units in McCoy Farms were distributed equally to all six children, and George Warner, Sr., was the manager of the limited liability company. Thus, the Debtor owned two of the twelve membership units. When one of the sons died, all remaining members gave their written consent for his surviving spouse,

Elizabeth Warner, to inherit his two ownership units in McCoy Farms.

In 2006, the Debtor, and some of his brothers, Kristian E. Warner, Andrew M. Warner, and Monroe P. Warner, needed capital funds to invest in business enterprises located in Morgantown, West Virginia. One of those enterprises was an apartment complex located close to the campus of West Virginia University commonly known as The Augusta on the Square. Because the four brothers did not have adequate capital to secure bank financing for the project, they approached Kasey to ascertain if he would loan them a portion of his life savings. Kasey agreed, and loaned his four brothers $500,000, as reflected in a July 1, 2006 promissory note.

The note accrued simple interest at the rate of 12% per anum, and was payable in 18 months unless the parties agreed in writing to an extension. Kasey stated that the note was to be paid after the completion of The Augusta on the Square, and after it achieved an 80% occupancy rate. The shared belief was that once The Augusta on the Square achieved the 80% occupancy rate, the four borrowing brothers could obtain refinancing and payoff the note owed to Kasey. In due course, The Augusta on the Square was completed, and it achieved an 80% occupancy rate; however, the four borrowing brothers were unable to obtain bank refinancing.[1]

Concerned that his brothers would not be able to timely obtain refinancing of The Augusta on the Square to repay his loan, Kasey asked his brothers in December 2008 to transfer their ownership units in McCoy Farms to him as payment/security for the loan.[2] All the brothers orally

---

[1] On June 8, 2008, Kasey received a $121,600 payment on his note. Rather than applying the payment to accrued interest, Kasey treated the payment as a reduction in principal. No other cash payments were made on the note.

[2] Regarding whether the transfer of shares was for repayment of the loan or for security, Kasey testified:

Kasey:       . . . . So I went to them, I said, look, this is a good vehicle for you all to pay your debt off to me or to secure it, put it as security so if something should happen to you and you died and you can't pay your debt, its mine.

Not that I gonna keep it away from their family or anything else. It's a family thing and all family, regardless of how the ownership works out, is gonna be able to use that.

But at least it would be a way to secure money that I had loaned them and that they owed me.

In fact, the transfer was made to me. I think it's a legal complete transfer

3

agreed to the transfer. On March 25, 2009, the brothers orally agreed to the transfer for a second time. Because it was all within the family, Kasey testified that no need existed to "sign a bunch of documents."

When Kasey went to prepare the K-1 tax statements for McCoy Farms, however, he realized that he was going to be required to show the different percentages of ownership, and he wanted to have some documents to justify his tax filings. Thus, on January 19, 2010, the Debtor signed a statement, prepared by Kasey, providing:

> I Benjamin F. Warner orally transferred all my share(s) of McCoy Farms LLC in Barbour County, WV personally to Karl K. Warner on March 25, 2009. This memorializes the March 25, 2009 oral transfer by me.

(Exhibit 6).

The Debtor filed his Chapter 7 bankruptcy petition on April 22, 2010.

### III. DISCUSSION

The Trustee asserts that the Debtor's transfer of his two ownership units in McCoy Farms to Kasey is either a preferential transfer under 11 U.S.C. § 547, or a fraudulent transfer under § 548 and/or applicable state law, W. Va. Code § 40-1A-1 et seq.

Pursuant to 11 U.S.C. §§ 547(b) and 548(a)(1), the trustee may avoid certain pre-petition "transfer[s] of an interest of the debtor in property. . . ." *See also* W. Va. Code § 40-1A-4 (stating that a transfer of property is an essential element of a claim to set aside the transfer as being

---

> to me. But the understanding and intent of everybody concerned is when they're back on their feet they can buy back their shares. I told them that there's more than – you know, I'm not gonna try to keep it to myself because its not mine, it's the families.
> And so they're gonna buy back their shares for the amount that they owed me when they are able to do that. But in the meantime, its mine until they're able to do that.

(Exhibit 1, p. 81-82).

Whether the attempted transfer of the Debtor's ownership units in McCoy Farms was in payment of the note or as security for the repayment of the note is not material to the court's decision.

4

fraudulent as to present and future creditors). If no transfer is made by a debtor, then no cause of action exists under 11 U.S.C. §§ 547, 548, or applicable state law.

Here, Kasey contends that he orally received the Debtor's ownership units in McCoy Farms pursuant to an agreement reached in December 2008. On March 25, 2009, Kasey again spoke to the Debtor and the Debtor confirmed that he transferred his ownership units in McCoy Farms to Kasey. On January 19, 2010, Kasey caused the Debtor to sign a statement reflecting that the Debtor orally transferred all his shares of McCoy Farms to Kasey on March 25, 2009 – the statement being for the purpose of memorializing the March 25, 2009 oral transfer.

Under West Virginia law, a limited liability company is a legal entity distinct from its members. W. Va. Code § 31B-2-201. All members may enter into an operating agreement to regulate the affairs of the company, the conduct of its business, and to govern relations among the members, managers and company. § 31B-1-103(a). When a member is entitled to a distributional interest in a limited liability company, that distributional interest is personal property that may be transferred in whole or in part. § 31B-5-501. When a member transfers a distributional interest, the transferee does not become a member of the limited liability company, § 31B-5-502, but may become a member "if and to the extent that the transferor gives the transferee the right in accordance with authority described in the operating agreement or all other members consent." § 31B-5-503(a).

The affairs of McCoy Farms are governed by its November 15, 2003 First Amended and Restated Operating Agreement. Regarding the assignment of ownership units in McCoy Farms by its members, the Operating Agreement states:

> 9. **Assignment of Interests In Company**
> The Units shall not be assigned, in whole or in part, and the assignee shall not be admitted as a substitute member, except in accordance with the provisions of this Section.
>
> . . . .
>
> b. <u>Conditions on Assignments</u>
> (1) (A) Transfer for Value. Except as otherwise provided in this Agreement, no Member . . . shall transfer . . . his or her Unit . . . to any person . . . not a party to this Agreement unless such Member first notifies the Company, and all other Members, pursuant to paragraph (2), below, of his or her intention to do so, and receives prior written consent of all remaining Members to the transfer. . . .
>
> . . . .
>
> (2) (A) The Selling Member . . . shall first notify the Company of his or her intention to dispose of the Unit or Units and offer in writing to sell such

5

Unit or Units to the Company. The Company shall have a period of sixty (60) days in which to accept such offer and notify the Selling Member . . . of such acceptance.

(B) In the event the Company does not accept such offer, the Selling Member . . . shall immediately thereafter notify all of the other Members of his or her intention to dispose of the Unit or Units and offer, in writing, to sell such Unit of Units to the other Members. Within ninety (90) days after receipt of such notice, one or more of the Members may accept such offer . . . .

(Exhibit 9).

Here, the Debtor attempted to transfer his ownership units to Kasey – not just his distributional interest[3] – in exchange for a release from the July 1, 2006 note. Assignments of ownership units are expressly prohibited by § 9 of the Operating Agreement. The only exceptions to the prohibition on assignment are specifically set forth in § 9(b). In particular, § 9(b)(1)(A) allows a membership unit to be transferred for value to a non-member if certain conditions are met. Kasey was already a member of McCoy Farms before the Debtor attempted to transfer his membership interest to Kasey; thus, the exception allowing a transfer for value does not expressly apply to the attempted transfer between the Debtor and Kasey.

Even if the court were to interpret the language of § 9(b)(1)(A) to include transfers of value to both members and non-members, the conditions of that subsection have not been met. Transferring an ownership unit requires the transferring member to first notify McCoy Farms, and then all other members, of the intention to transfer ownership. When transfers are for value, the prior written consent of all members is required before the transfer can be made.

No evidence suggests that McCoy Farms, being managed by George Warner, Sr., was offered the opportunity to purchase the Debtor's ownership units. Under § 9(b)(2)(A), McCoy Farms would have a period of 60 days to consider such an offer.

After that 60-day period, the Debtor was then required to offer his ownership units for purchase to all other members, who then had 90 days to accept the offer. § 9(b)(2)(B). As of the date of the alleged oral and written transfer of ownership units from the Debtor to Kasey, there were

---

[3] Kasey testified that McCoy Farms did not make money and there were no distributions to its members.

six members holding ownership units: the Debtor, Kasey, Andrew, Monroe, Kristian, Benjamin, and Elizabeth Warner. No indication exists that any of the other members were offered the opportunity to purchase the Debtor's membership units.

Finally, under § 9(b)(1)(A), no documentation exists evidencing that the Debtor obtained the prior written consent of all other Members to allow him to transfer his ownership units to Kasey for value.

Consequently, the court cannot conclude on summary judgment that a transfer exists of the Debtor's membership units in McCoy Farms to Kasey because: (1) the First Amended and Restated Operating Agreement of November 15, 2003 expressly forbids the transfer of a membership unit; (2) the stated exception to allow transfers of a membership interest for value in the Operating Agreement does not expressly apply to a transaction between members; (3) the Debtor's membership units were not first offered for sale to McCoy Farms; (4) the Debtor's membership units were not offered for sale to all other members; and/or (5) the prior written consent of all members to allow the transfer of the Debtor's ownership units was not obtained.

## IV. CONCLUSION

Because the Trustee has failed to show that the Debtor transferred his ownership units to Kasey, the Trustee has failed to prove an essential element of his causes of action under 11 U.S.C. §§ 547 and 548, and applicable state law. Therefore, the court will enter a separate order that denies the Trustee's motion for summary judgment.